UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:23-cv-00261-RJC
(3:18-cr-00292-RJC-DSC-2)

| | | |
|---|---|---|
| LAURENCE SESSUM, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

THIS MATTER is before the Court on Petitioner's Pro Se Motion to Vacate, Set Aside

or Correct Sentence under 28 U.S.C. § 2255 [CV Doc. 1],[1] Petitioner's "Motion for Leave to Reply

to the Government's Response to His Petitioner for Collateral Relief Under Title 28 U.S.C. Section

2255" [CV Doc. 4], and Petitioner's "Motion for Leave to Supplement His Petition for Collateral

Relief Under 28 U.S.C. Section 2255 Based on Recent Supreme Court's New Constitutional

Change in Decisional Law" [CV Doc. 5].

I.     BACKGROUND

    A.     Offense Conduct

    Between October 2013 and January 2017, Petitioner Laurence Sessum ("Petitioner") and

Jacqueline Okomba engaged in a debt-collection scheme that collectively defrauded victims out

of approximately $6 million.  [CR Doc. 129 at 196: Trial Tr.; CR Doc. 83 at ¶¶ 16-17: Presentence

---

[1] Citations to the record herein contain the relevant document number referenced preceded by either the
letters "CV," denoting that the document is listed on the docket in the civil case file number 3:23-cv-00261-
RJC, or the letters "CR," denoting that the document is listed on the docket in the criminal case file number
3:18-cr-00292-RJC-DSC-2.

Investigation Report (PSR)].  In October 2013, Petitioner and Okomba opened Direct Processing, LLC, which collected "out of statute" debts, meaning the debts were no longer enforceable because the statute of limitations had run.  United States v. Okomba, Nos. 20-4077 & 20-4079, 2022 WL 1261997, at *1 (4th Cir. 2022).

Petitioner identified victims by buying lists of debtors with such debt.  See id.  Direct Processing called debtors using dialer services and left automated messages, directing them to contact the company to resolve the purported debts.  Id.  Petitioner provided scripts of messages to the dialer service containing false and misleading information, including threats of pending legal action against the debtors.  The debtors were told to be "prepared to provide attorney information, schedule [their] court date, and make a statement on [their] behalf for the record."  [CR Doc. 128 at 95-96, 102-3: Trial Tr.].

If a debtor responded to the message, they were connected to a Direct Processing employee.  Okomba, 2022 WL 1261997, at *1.  "These employees used scripted pressure tactics that built on the automated messages, coercing debtors into paying some, all, or more than their alleged debt."  Id.  Employees earned bonuses the more they collected.  Id.  Although "Direct Processing lacked legal authority to enforce out-of-statute debts," employees were "trained to inflate the purported debts and tell debtors that Direct Processing would be serving them with legal process, including judgment, wage garnishments, or liens."  Id.  They also "warned debtors of imminent arrest if the debts went unpaid."  Id.  When debtors agreed to pay, employees emailed Petitioner payment information for processing.  Id.  At times, Petitioner reprimanded employees who threatened debtors with arrest, but such employees rarely faced discipline and, if they were fired, the company often rehired them.  Id.  With this scheme, the company collected over $6 million in its first three years of operation.  Id.

2

Direct Processing formed several affiliated companies as part of its operations. Id. Direct Processing and these alter egos maintained at least fifteen bank accounts, with collections deposited in six of those accounts. Petitioner and Okomba controlled the primary bank accounts, including Direct Processing's own accounts that received over $4.5 million in collections. Petitioner and Okomba regularly directed funds from Direct Processing to the alter egos. Id.

On August 2, 2015, the FBI executed a search warrant at Direct Processing's office in Charlotte, North Carolina. [CR Doc. 83 at ¶ 12]. The evening before the search Petitioner learned, when attempting to login to a Direct Processing account, that it had been frozen. [Id. at ¶ 11]. In response, Petitioner contacted employee Cameron Leach and asked him to go to the offices "[t]o clear out the computers" because a "raid" was coming. [CR Doc. 129 at 64; CR Doc. 83 at ¶ 11]. When Leach arrived, Petitioner and Okomba were already there. [CR Doc. 83 at ¶ 11]. Leach and the others loaded computer hard drives and some telephones and computer monitors into several cars and took them to Leach's home. [CR Doc. 129 at 65].

When FBI agents arrived at Direct Processing's offices the next day, "they discovered most cubicles were missing computers. Sessum, 2022 WL 1261997, at *2. They found several scripts describing the debt-collection practices and paperwork referencing some of the false company names collectors used when referring to Direct Processing. Id. When agents inquired about computers, Sessum refused to discuss them, and Okomba denied owning any. Id. Petitioner admitted that he discovered the frozen account the night before. Id. After "everything … cooled down" a couple of weeks after the search, Leach brought the equipment to a different office space. [CR Doc. 129 at 68]. When the FBI searched the new office, it again recovered scripts "describing legal consequences for debtors if they failed to pay and letters to debtors on other companies' letterhead." Sessum, 202 WL 1261997, at *2.

3

### B.   Criminal Proceedings[2]

On March 5, 2018, after receiving a target letter, Petitioner retained attorney Robert K. Trobich. [CV Doc. 3-9 at ¶ 1: Trobich Aff.]. Sometime thereafter, Trobich met with the prosecutor to discuss the case and received some discovery pursuant to a pre-indictment discovery agreement. [CV Doc. 3-9 at ¶ 2]. The Government also did a reverse proffer with Trobich and his investigator present. [CV Doc. 3-9 at ¶ 2]. On July 27, 2018, the prosecutor sent Trobich an email attaching a proposed plea agreement, bill of information, and factual basis, which allowed Petitioner to plead guilty to a Bill of Information charging him with one count of conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371 and carried a maximum sentence of five years. [CV Docs. 3-1, 3-2 at ¶¶ 1, 5]. The offer was made "in exchange for the government forgoing substantive wire fraud and money laundering charges." [CV Doc. 3-1; see CV Doc. 3-2 at ¶ 2].

On August 15, 2018, Trobich emailed the prosecutor to request additional time for Petitioner to consider the plea offer. [CV Doc. 3-5 at 3]. In this email, Trobich also advised the prosecutor that "the app to view the discovery disc seems to have issues, and that has slowed the process of reviewing those materials." [Id.]. In response the same day, the prosecutor emailed that he could keep the offer open until August 20. [Id. at 2]. The prosecutor copied someone to help with Trobich's technical issues. [Id.].

On August 22, 2018, Petitioner and Okomba were charged in Bill of Indictment with one count of Fraudulent Debt Collection Conspiracy in violation of 18 U.S.C. § 1349 (Count One); one count of Wire Fraud Scheme and aiding and abetting the same in violation of 18 U.S.C. §§

---

[2] This summary is derived from the record in the criminal proceeding and from evidence presented at the November 9, 2023 evidentiary hearing, where appropriate. The Government's hearing exhibits are identified as "Gov't Ex. __" and Petitioner's as "Pet'r Ex. __."

4

1343 and 2 (Count Two); one count of Conspiracy to Commit Money Laundering in violation of 18 U.S.C. § 1956(h) (Count Three); and one count of Destruction of Objects and Records and aiding and abetting the same in violation of 18 U.S.C. §§ 1519 and 2 (Count Four).

On August 23, 2018, Trobich emailed the prosecutor advising that Petitioner was "willing to take the plea if there are not other individuals charged in this matter." [CV Doc. 3-5 at 1]. The prosecutor promptly responded that the Government was "unwilling to make promises about charging any other potential targets in this case." [Id.]. On November 15, 2018, the Government offered another plea agreement pursuant to which Petitioner would have pleaded guilty to Count One and Counts Two, Three, and Four would have been dismissed, capping Petitioner's sentence at 20 years. [CV Docs. 3-6, 3-7]. Petitioner rejected that plea deal.

On April 7, 2019, the day before evidence was set to begin in Petitioner's trial, Trobich filed a motion to dismiss, arguing that Counts One, Two, and Three of the Indictment be dismissed because "[t]he entirety of the conduct the Governments complains of" therein falls under either 15 U.S.C. § 53(b) of the Federal Trade Commission Act (FTCA) or the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692, et seq. [CR Doc. 61]. The Court denied the motion as untimely and also on the merits. [CR Doc. 128 at 8]. The Court noted that "the existence of civil remedies for conduct that is alleged to have occurred in this case [does not bar] the government from bringing an action for fraud." [Id.]. The matter proceeded to trial. During deliberations, the jury queried whether email communications are considered wire communications. [CR Doc. 143 at 3]. The Court answered that question affirmatively, [id. at 14], and the jury found Petitioner guilty on all four counts.[3] [CR Doc. 66: Jury Verdict].

_____

[3] The Jury found Okomba guilty on Counts One and Four. [CR Doc. 65: Jury Verdict].

Before sentencing, a probation officer prepared a PSR. [CR Doc. 85]. On Counts One and Two, the probation officer recommended a base offense level of seven, an 18-level enhancement for a loss amount greater than $3.5 million, a two-level enhancement for more than 10 victims, a two-level enhancement for use of sophisticated means, a four-level enhancement for Petitioner's role in the offense, and a two-level enhancement for obstruction of justice, for an adjusted offense level of 35. [Id. at ¶¶ 48-55]. For Count Three, the probation officer recommended an initial base offense level of six, to be increased by 18 levels for the loss amount, two levels for having more than 10 victims, and two levels for using sophisticated means, for a recommended base offense level of 28. [CR Doc. 83 at ¶ 57]. This level was enhanced by two levels because Petitioner was convicted under 18 U.S.C. § 1956, by four levels for Petitioner's role in the offense, and by two levels for obstruction of justice, yielding an adjusted offense level of 36 on Count Three. [Id. at ¶¶ 57-62]. Because the recommended adjusted offense levels for Counts One, Two, and Four were lower than 36, the Total Offense Level was 36. [See id. at ¶¶ 55, 68, 72]. Based on an offense level of 36 and a criminal history category of II, the sentencing guidelines recommended a range of 210 to 262 months' imprisonment. [Id. at ¶¶ 78, 98]. The Court varied downward to an offense level of 32, citing unwarranted sentencing disparities among defendants and overstatement of loss and to "avoid the appearance of double counting on guideline enhancements," and sentenced Petitioner to concurrent terms of imprisonment of 135 months on each count.[4] [CR Doc. 109 at 2: Judgment; CR Doc. 110 at 3: Statement of Reasons].

Petitioner appealed and retained Attorney Patrick Megaro to represent him. [CR Docs. 105, 113]. On appeal, Petitioner argued that the Court erred in denying the motion to dismiss for lack of jurisdiction, that there was insufficient evidence to support his convictions, and that the

---

[4] The Court also entered a money judgment and order of forfeiture against Sessum in the amount of $1,548,491.29. [CR Doc. 108].

Court erred in answering the jury's question about whether emails are wire communications under 18 U.S.C. § 1343. <u>Sessum</u>, 2022 WL 1261997, at *4-*8. Petitioner also challenged the Court's determination of the loss amount used to enhance Petitioner's sentence by 18 levels. <u>Id.</u> at *10. The Fourth Circuit affirmed. <u>Id.</u> at *12. Petitioner did not petition the Supreme Court for writ of certiorari.

### C. Petitioner's Motion to Vacate

On May 1, 2023, Petitioner filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence. [CV Doc. 1]. Petitioner argues that he received ineffective assistance of counsel during plea negotiations, pre-trial, trial, and sentencing and on appeal. [<u>Id.</u> at 4]. Petitioner also argues that "the court lacked federal personal and subject matter jurisdiction over [his] alleged North Carolina common law fair debt collection offenses or violations, and the prosecution failed to satisfy the federal jurisdictional interstate elements of mail and wire fraud." [<u>Id.</u> at 3-4]. In this regard, Petitioner attested that he is "factually, actually, and legally innocen[t]" of these crimes and his conviction and sentence constitute "a complete miscarriage of justice." [<u>Id.</u> at 4].

As to Petitioner's claims of ineffective assistance of counsel, Petitioner argues that (1) Trobich and Megaro "fundamentally failed to understand the law and object to the court's lack of personal lack of jurisdiction subject matter over the case," [CV Doc. 1 at 13]; (2) Trobich provided ineffective assistance during plea negotiations because his "advice … was wholly insufficient to enable [Petitioner] to make a sound – knowing, intelligent, and voluntary decision whether to accept the prosecution's July, 2018 plea bargaining offer 'only' to a one count information document" because Trobich failed to advise Petitioner of the 5-year statutory maximum sentence to that count and "was adamant about prevailing with a 'not guilty' verdict," [<u>Id.</u> at 15-16]; (3) Trobich "motivated and reinforced" Petitioner's decision to reject the August 2018 plea deal by

his "persistent urge to prevail without a plea of guilty" despite the lack of a "viable defense" [Id. at 17]; (4) Trobich "failed to conduct any investigation to properly prepare to subject the prosecution to any adversarial testing process in support of a viable defense;" [Id. at 18; see id. at 20]; (5) Trobich failed to explain the sentencing differences in pleading guilty to the single-count 5-year statutory maximum Information and the "combined 50+-year statutory maximum penalties by proceeding to trial" on the multiple count Indictment, [Id.]; (6) Trobich failed to advise Petitioner on the application of the sentencing guidelines between pleading guilty and going to trial, including reductions for acceptance of responsibility and enhancements for "leadership role culpability [and] relevant conduct or reasonable foreseeability of all the related conduct of other co-defendants as long as [he] was convicted on the Section 371 conspiracy offense," [Id. at 18-19]; (7) Trobich failed to explain the difference in an open guilty plea and a conditional plea and "the potential alternative routes to take to reap the best benefit," [Id. at 19]; (8) Trobich and Megaro failed to object to and challenge the Indictment, which was defective on its face, [Id. at 22]; and (9) Megaro failed to file a petition for writ of certiorari for Petitioner and "arbitrarily abandoned the appeal process without notice by unexpectedly filing an Anders-type brief" and "moving to withdraw as counsel prior to the deadline for filing the writ,"[5] [Id. at 24].

For relief, Petitioner asks that "the case should be vacated" and he should be allowed to plead guilty to the Bill of Information, [CV Doc. 1 at 20], and that Count One of the Indictment should be dismissed, [see id. at 24].

---

[5] Petitioner also asserts that Megaro sought and obtained $3,000.00 from Petitioner to attend oral arguments on Petitioner's appeal, but that no oral argument on Petitioner's appeal occurred and that Petitioner never heard from Megaro again. [CV Doc. 1 at 25-26]. The Court declines to address this issue, as it is a matter for the North Carolina State Bar not this Court.

On the Court's Order,[6] the Government responded to Petitioner's motion, conceding that an evidentiary hearing was necessary because factual disputes regarding assistance of counsel during plea negotiations exist. [CV Docs. 2, 3]. Two weeks after the Government's response, Petitioner filed his other pending motions in this case in which he purports to seek leave to reply to the Government's response[7] [CV Doc. 4] and seeks leave "to supplement his petition" with the Supreme Court's "constitutional change in decisional law" and to assert an additional claim of ineffective assistance[8] [CV Doc. 5], respectively. On November 8, 2023, the Court conducted an evidentiary hearing on the issue of ineffective assistance of counsel during plea negotiations. [11/9/2023 Minute Entry].

### E.     Evidentiary Hearing

Petitioner and Trobich both testified at the hearing. [CV Doc. 19: Hearing Tr.].

Petitioner testified on direct examination as follows. Petitioner retained Trobich in March of 2018. [Id. at 5]. The prosecution conducted a reverse proffer in July 2018, but Trobich told him he was not invited to attend. [Id. at 5-6]. Trobich met with Petitioner "briefly" for "maybe 15 minutes" after the reverse proffer to drop off the bill of information and factual basis. [Id. at 6]. At this meeting, Trobich told Petitioner that the Government had made a pre-indictment offer

---

[6] The Court also ordered that Petitioner may file a reply to the Government's response pursuant to Rule 5(d) of the Rules Governing Section 2255 Proceedings and that any such reply must be filed within 21 days of the Government's response. [CV Doc. 2].

[7] In this motion, Petitioner acknowledges the Government's concession to an evidentiary hearing on the issue of ineffective assistance relative to plea negotiations but argues that the Court should conduct an evidentiary "in whole … on each one of Mr. Sessum's underlying claims," especially the Government's "lack of subject matter jurisdiction to prosecute the case…." [CV Doc. 4]. Thus, despite its caption, Petitioner substantively moves for an evidentiary hearing on all issues raised in his motion to vacate, which the Court will deny. To the extent Petitioner intended to move to substantively reply to the Government's motion, the Court will deny that request as moot. Petitioner was explicitly afforded the opportunity to file a reply [see CV Doc. 2] and failed to do so.

[8] The Court will grant this motion and considers Petitioner's claims below.

for Petitioner to plead guilty. [Id.]. Trobich, however, did not give Petitioner a copy of the plea offer at this time. [Id. at 7]. Trobich conveyed that the offer called for Petitioner to plead guilty to one count of conspiracy and that "the plea recommended five years." [Id.]. When Trobich came by to drop off the bill of information and the factual basis, he "didn't really go over" the documents with Petitioner and Trobich told Petitioner he would get the draft plea agreement "later on." [Id. at 7-8]. Trobich did not review any discovery materials with Petitioner at that time. [Id. at 10].

Trobich did not review the sentencing guidelines or explain what the guidelines are or what they mean until after trial during the sentencing phase. [Id. at 8]. Trobich never told him that the maximum sentence of the first plea offer was five years, only that it was a "recommendation." [Id. at 8-9]. Trobich never explained to him what the potential sentencing guidelines were for wire fraud if Petitioner went to trial. [Id. at 8, 11]. Petitioner told Trobich he was willing to plead guilty, but Petitioner wanted to find out whether the Government would accept an additional term that Okomba would not be charged. [Id. at 9].

At the time he was expected to decide whether to plead guilty, he "didn't get a chance to really even review the discovery." [Id.]. There was an issue with the discovery disk provided by the Government at the reverse proffer and Petitioner thought "it was some problem with it where [Trobich] couldn't open it." [Id. at 10]. Trobich only gave Petitioner "limited access to the reverse proffer" and did not review "the main disc … until maybe three days before trial." [Id.].

Trobich explained to him that if he did not accept the initial plea offer Petitioner "might get charged with wire fraud and maybe obstruction, but everything would run concurrent." [Id. at 11]. Petitioner, however, did not have "any idea what [his] true or even estimated criminal exposure was going to trial versus the plea offer." [Id. at 11-12]. Trobich told him that if they went to trial, they would "be fighting on a defense of the [FDCPA]," which calls for civil not

criminal prosecution. [Id. at 12]. Trobich made him "feel confident" in a "good shot of possibly getting an acquittal because it was in black and white what the law actually states." [Id. at 13]. Trobich did not file a motion to dismiss based on the FDCPA until the night before trial. [Id.].

The Government offered a second plea offer, but when Trobich presented it to him over the phone, "he led it off with 20 years exposure" and the conversation "didn't go any further." [Id. at 15]. Trobich did not explain at this time what Petitioner's sentencing exposure would be, including the sentencing guidelines, if he proceeded to trial. [Id.]. Trobich did not explain that there was a three-level reduction for acceptance of responsibility if Petitioner accepted the plea offer. Petitioner testified that he was guilty of the crimes he was convicted of. [Id. at 15-16].

On cross examination by the Government, Petitioner acknowledged that in his motion to vacate he claimed to be "actually and factually innocent" of the offenses of conviction and that he submitted that claim under penalty of perjury. [Id. at 21-22]. Petitioner maintained that he never received a copy of the first plea agreement. Petitioner testified that he never "technically" rejected the first plea offer, but rather he made a counteroffer including the term that Okomba would not be prosecuted. [Id. at 23]. Petitioner testified that he understood that generally pleading guilty results in a "better deal than if you proceed to trial." [Id. at 25]. Petitioner admitted that his criminal conduct resulted in over $3.5 million in loss, that he was the leader of that offense, that the offense involved ten or more victims, and that he attempted to obstruct justice by interfering with the prosecution and removing computers once he learned the accounts were frozen. [Id.]. Petitioner also admitted that when Trobich met with Petitioner at his house after the reverse proffer that they went over "some of the evidence against" the Petitioner at that time. [Id. at 28]. Petitioner testified that he knew that the Government's second plea offer, which was in November 2018, had a 20-year sentencing cap, but maintained that he never received a copy of it. [Id. at 29]. Petitioner

testified that he "reluctantly" rejected the initial plea offer and that he proceeded to trial "on the assumption that [Trobich] was going to go with the defense that he suggested to me." [Id. at 30].

Petitioner further testified that, while Trobich "didn't force [Petitioner] to do anything," he "didn't really give [Petitioner] all of the information for [Petitioner] to make the right choices for [himself]." [Id. at 30]. Petitioner testified that he believed the Government's case was "weak and jurisdictionally questionable … based on the limited amount of information" he had. [Id. at 31]. Petitioner admitted that he never asked Trobich "for any information [he] thought [he] needed in order to make an informed decision" because Trobich was the lawyer, and Petitioner should not have had to ask. [Id. at 32]. On redirect, Petitioner testified that Trobich never told him what the offense maximums were for either the first or second plea agreements. [Id. at 32-33].

Trobich testified as follows. After Petitioner retained him, Trobich called the Government to discuss the case. [Id. at 40]. The Government offered to do a reverse proffer. Trobich told Petitioner he could attend the reverse proffer, but Trobich did not recommend one way or the other whether he should attend. Trobich also asked Petitioner for his approval to bring Trobich's investigator to the proffer. [Id. at 40-41]. Trobich received some discovery at the proffer, which he brought to Petitioner's house afterwards to review. [Id. at 41]. Trobich did not remember whether the Government made its first plea offer at the reverse proffer or "in close proximity" thereafter. [Id. at 41-42; see id. at 56].

On July 27, 2018, Trobich received an email from the Government laying out the first plea offer and enclosing the first proposed plea agreement, the Bill of Information, and the factual basis. [Id. at 42-43; Gov't Ex. 1]. The email provided that the charge "has a five-year cap and that the government won't pursue more serious charges" and the plea offer attached set forth the statutory maximum five-year sentence. [Id. at 43; Gov't Ex. 2]. Trobich went to Petitioner's home, gave

him a copy of this plea agreement, and discussed the statutory cap with him, as well as other terms of the plea agreement. [Id. at 44, 46]. Trobich "probably" gave Petitioner a copy of the factual basis and Bill of Information, but he did not specifically recall "handing him" those documents. [Id. at 45]. Trobich advised Petitioner that the sentencing exposure in the first plea offer was "way less than what they're shooting for" and that "by pleading guilty he would receive a reduction due to acceptance of responsibility." [Id. at 46]. Trobich never told Petitioner that the five-year sentence was only a "recommendation." [Id.]. When he presented the plea deal to Petitioner he told him, "If they come for you at trial and they can prove these numbers, it's going to be way worse." [Id. at 47]. At that point, Petitioner was "not inclined" to accept a plea. [Id.]. When the deadline approached, Petitioner asked for more time to consider the deal. [Id.] In addition, there were some issues with the application needed to view the discovery, which "[had] slowed the process of reviewing those materials." [Id. at 61]. For these reasons, Trobich asked the Government for more time and the Government agreed. [Id. at 61-62, 47]. As the extended deadline approached, Petitioner told Trobich he would accept the deal if the Government agreed not to pursue charges against Okomba. [Id. at 47-48; Gov't Ex. 5]. Trobich brought the counteroffer to the Government, and it was rejected. [Id. at 48]. Petitioner was indicted soon thereafter. [Id.].

After Petitioner was indicted, Trobich reviewed the charges with him, which were the same charges raised at the reverse proffer, and the potential penalties they carried. [Id. at 49]. Trobich focused on the sentencing guidelines because "a big part of that guideline range was going to be the loss." [Id.]. The loss amount was "always an issue in discussions with [Petitioner]. He always thought that that number was way too high." [Id.]. Trobich recalled having "several discussions about guideline ranges because that was always a point that [they] needed to talk about." [Id.].

As the case approached trial, the Government offered a second plea deal, which carried a statutory maximum of 20 years. [Id. at 50; Gov't Ex. 6]. Trobich presented the deal to Petitioner over the phone, but the conversation did not last long. [Id. at 51]. Trobich later brought Petitioner a physical copy of that offer. [Id. at 52]. Trobich never characterized the Government's case as "weak" and has never so characterized a case to a defendant in his career. [Id.]. Trobich felt comfortable that Petitioner understood his options "as to whether or not he could plead guilty or proceed to trial" and that Petitioner made the decision to proceed to trial. [Id. at 53].

From the very beginning of his communications with Petitioner, Petitioner insisted that "what he and his company were doing was not fraudulent, that they were not engaged in fraud, and this should not be and was not a criminal offense." [Id. at 53]. Trobich told Petitioner more than once that he would present the argument that the conduct violated the FDCPA and was not subject to criminal prosecution to preserve it for Petitioner but that "the case law [was] not in [their] favor." [Id. at 53-54]. Petitioner never complained about having rejected the first plea offer and tried to hire Trobich to handle his appeal. [Id. at 54].

## II.     STANDARD OF REVIEW

A federal prisoner claiming that his "sentence was imposed in violation of the Constitution or the laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. "[W]hen a movant presents a colorable Sixth Amendment

claim showing disputed facts beyond the record, or when a credibility determination is necessary to resolve the claims," an evidentiary hearing is necessary. United States v. Mayhew, 995 F.3d 171, 176-77 (4th Cir. 2021) (citing United States v. Witherspoon, 231 F.3d 923, 926-27 (4th Cir. 2000)).

## III. DISCUSSION

### A. Petitioner's Jurisdictional Claims

Petitioner argues that this Court lacked personal and subject matter jurisdiction in his criminal proceeding. [CV Doc. 1 at 3-4, 6-11]. Petitioner argues that Direct Processing was not a debt collection agency under either state or federal law because it was collecting its own debt. [Id. at 6-8]. Petitioner asserts that jurisdiction was not authorized under the North Carolina long-arm statute, and the debtors were contacted by another company, which was in New Jersey. [Id. at 9-10]. Petitioner also argues that the mail and wire fraud charges are facially unconstitutional as applied because the fraudulent offenses "do not substantially affect interstate commerce." [Id. at 10-11]. These claims fail.

Petitioner waived and procedurally defaulted any challenge to personal jurisdiction because he did not raise this claim before this Court or on direct appeal. See Bousley v. United States, 523 U.S. 614, 621-22 (1998); Rector v. Approved Sav. Bank, 265 F.3d 248, 253 n.2 (4th Cir. 2001). Petitioner's challenge to personal jurisdiction lacks merit in any event. Petitioner's challenge is grounded in civil, not criminal, law. "Personal jurisdiction in a federal criminal prosecution 'is supplied by the fact that [the defendant] is within the territory of the United States.'" United States v. Underwood, 726 Fed. App'x 945, 948 (4th Cir. 2018) (quoting United States v. Burke, 425 F.3d 400, 408 (7th Cir. 2005)). "When a District Court has subject matter jurisdiction over the criminal offenses charged, it has personal jurisdiction over the individuals

charged in the indictment and present before the court to answer those charges." United States v. McLaughlin, 949 F.3d 780, 781-82 (2d Cir. 2019). Here, the Court had personal jurisdiction over Petitioner, who was in the United States and was charged in the indictment with federal crimes.

Petitioner challenged the Court's subject matter jurisdiction in his motion to dismiss and on appeal, arguing that civil remedies existed that were a bar to criminal proceedings. The Fourth Circuit rejected this argument on direct appeal, and Petitioner may not revisit it here. Sessum, 2022 WL 1261997 at *4. A defendant "may not circumvent a proper ruling … on direct appeal by re-raising the same challenge in a § 2255 motion." United States v. Linder, 552 F.3d 391, 396-97 (4th Cir. 2009); Boeckenhaupt v. United States, 537 F.2d 1182, 1183 (4th Cir. 1976) (per curiam) (claims considered on direct review may not be recast "under the guise of collateral attack").

Petitioner also argues that the jurisdictional elements of the mail and wire fraud conspiracy and wire fraud statutes were not met because "the fraudulent offenses, in question, do not substantially affect interstate commerce." [CV Doc. 1 at 11]. The jurisdictional element of the wire fraud statute "requires use of interstate wire facilities." Neder v. United States, 527 U.S. 1, 20 (1999); see United States v. Taylor, 942 F.3d 205, 214-15 (4th Cir. 2019). On Petitioner's direct appeal, the Fourth Circuit noted that "a substantive wire-fraud conviction requires that a defendant (1) devised or intended to devise a scheme to defraud and (2) used or caused the use of wire communications in furtherance of that scheme." Sessum, 2022 WL 1261997, at *5. The Fourth Circuit held that sufficient evidence supported both the wire fraud conspiracy and the substantive wire fraud offenses. Id. at *6. The Court also noted it was "undisputed" that Petitioner used emails to further the scheme and held that this Court correctly informed the jury that emails are wire communications. Id. at *7-8. Petitioner may not revisit here issues already decided on

direct appeal. Moreover, this Court had subject matter jurisdiction over his criminal offenses in any event. See 18 U.S.C. § 3231.

**B.** **Ineffective Assistance of Counsel**

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). To establish prejudice, the petitioner must demonstrate there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. It is not sufficient to show the mere "'possibility of prejudice.'" Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1994) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

### 1. Failure to Raise Jurisdictional Challenges

Petitioner claims that his trial and appellate counsel were ineffective for failing to argue that this Court lacked jurisdiction because Direct Processing "was not a debt collection agency" and because no interstate nexus for the mail[9] and wire fraud offenses were shown. [CV Doc. 1 at 13]. As already addressed, this Court had personal jurisdiction over Petitioner and subject matter jurisdiction over the federal criminal offenses with which he was charged. Petitioner cannot show deficient performance or prejudice for the failure to raise meritless issues at trial or on appeal. See Rodriguez v. Bush, 842 F.3d 343, 346 (4th Cir. 2016) (holding "[a] defendant is not prejudiced if his counsel fails to make an objection that is 'wholly meritless under current governing law'") (quoting Lockhart v. Fretwell, 506 U.S. 364, 374 (1993)).

Petitioner also claims that his trial and appellate counsel should have objected to Count One of the Indictment as defective because "fraudulent debt collection conspiracy," the shorthand description of Count One, is not an "enumerated crime." [CV Doc. 1 at 22-24; see CR Doc. 3 at 6]. Count One charged Petitioner with mail and wire fraud conspiracy in violation of 18 U.S.C. § 1349. [CR Doc. 6 at 6]. Part of the object of that conspiracy was to obtain "money and property by means of false and fraudulent pretenses, representations, and promises," which Petitioner did through fraudulent debt collection practices. Id.; see Sessum, 2022 WL 1261997, at *5. The shorthand description of the offense used in the Indictment does not alter the charge. Again, Petitioner cannot show deficient performance or prejudice for the failure to raise meritless issues. See Rodriguez, 842 F.3d at 346.

### 2. Ineffective Assistance Relative to Plea Negotiations

---

[9] The jury found that only wire fraud, not mail fraud, was an object of the conspiracy. [CR Doc. 66 at 1].

Defendants are entitled to effective assistance of competent counsel during plea negotiations. McMann v. Richardson, 397 U.S. 759, 771, 90 S. Ct. 1441 (1970). Effective assistance of counsel at the plea-bargaining stage requires that defense counsel "communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." Missouri v. Frye, 566 U.S. 134, 145, 132 S. Ct. 1399, 1408 (2012). This duty certainly applies where a plea offer is formal and with a fixed expiration date. Id.

"[C]ounsel does not have a general duty to initiate plea negotiations." United States v. Pender, 514 Fed. App'x 359, 361 (4th Cir. 2003). When plea negotiations are undertaken, however, defendants are entitled to the effective assistance of counsel during the plea negotiations. Lafler v. Cooper, 566 U.S. 156, 162-63 (2012). A defendant may show deficient performance where a defendant indicates a willingness to plead guilty but is persuaded by counsel to proceed to trial based on counsel's representation that the defendant will not be convicted due to a defense based on an incorrect legal rule, or where counsel fails to inform a defendant of a favorable plea deal. Id. at 160-63; Missouri v. Frye, 566 U.S. 134, 145 (2012). Moreover, "it is the responsibility of defense counsel to inform a defendant of the advantages and disadvantages of a plea agreement and the attendant statutory and constitutional rights that a guilty plea would forego." Libretti v. United States, 516 U.S. 29, 50-51, 116 S. Ct. 356, 368 (1995). Counsel, however, is not ineffective for failing to obtain a plea offer that a defendant is willing to accept. See Weatherford v. Bursey, 429 U.S. 545, 561 (1977) (recognizing "there is no constitutional right to plea bargain").

"To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance," a petitioner must "show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." Frye, 566 U.S. at 147, 132 S. Ct. at

1409.  Namely, a petitioner must "show the outcome of the plea process would have been different with competent advice."  Lafler, 566 U.S. at 163.  That is, he must show that "but for the ineffective advice of counsel there is a reasonable probability" that he would have pleaded guilty on terms that the prosecution and the court would have accepted, and the conviction or sentence under the plea "would have been less severe than under the judgment and sentence that in fact were imposed."  Id. at 164.  Courts, however, "should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." Lee v. United States, 137 S. Ct. 1958, 1967 (2017).  Rather, the court should look to contemporaneous evidence of his desire to pursue a particular course of action.  Id.

In his motion to vacate, Petitioner claims that Trobich did not advise him of the five-year statutory maximum of the § 371 charge in the first plea offer; failed to explain the difference in sentencing exposure in pleading guilty to that charge and proceeding to trial on the Indictment, including how the sentencing guidelines might apply; that his attorney was "adamant" they would win before a jury because the prosecution's case was "weak;" that Trobich "reinforced" his decision to reject the first plea offer; and that Trobich failed to explain the difference in an open guilty plea and conditional guilty plea.  [CV Doc. 1 at 16-19].  Petitioner contends that he did not learn of the five-year maximum penalty until after trial and that he would have accepted the first plea offer if he had known.  [Id. at 17, 20].

After the evidentiary hearing in this matter, the Court is convinced that Petitioner received constitutionally effective assistance of counsel during plea negotiations in this case.  Petitioner undermined his own credibility from the beginning.  In his motion to vacate, Petitioner claimed that he was "factually, actually, and legally innocent" of the offenses of conviction. Yet, at the hearing in this matter, Petitioner acknowledged that he is guilty.  Petitioner also testified and claims

20

that he never received a copy of the first plea offer, which expressly stated the five-year statutory cap on the § 371 charge, and that Trobich never told him that five years was the maximum sentence on that charge. The Court finds these claims incredible in light of Trobich's recollection of having given a copy of the first plea offer to Petitioner and advising Petitioner that the sentence was capped at five years and that this sentencing exposure was "way less" than what the Government would be "shooting for" in an Indictment.

Petitioner testified that Trobich told Petitioner he could not attend the reverse proffer. The Court is skeptical of this testimony given Trobich's testimony that he told Petitioner it was Petitioner's decision to attend or not and there being no apparent reason for Trobich to have excluded Petitioner from the proffer. Petitioner testified that Trobich did not review the discovery materials with him when Trobich visited him at home after the reverse proffer and that Petitioner never really reviewed the discovery, claiming that Trobich was never able to open the disk. Later, Petitioner admitted that he and Trobich did review "some of the evidence against" Petitioner at his home after the reverse proffer. Given this conflicting testimony and Trobich's testimony that they reviewed discovery after the reverse proffer and that a computer issue merely slowed down the review of discovery, the Court finds Petitioner's testimony and claims on this issue unreliable.

Petitioner claims and testified that Trobich believed and communicated they would win at trial on the FDCPA defense because the law on the issue was "black and white." The Court finds this testimony unbelievable in light of Trobich's credible testimony that he told Petitioner he would argue and preserve the issue, but that "the case law [was] not in [their] favor."

Petitioner testified that Trobich never told him what the maximum sentences were for the first or second plea agreements, but later admitted that he knew that the Government's second plea offer carried a 20-year maximum sentence. The Court, therefore, is not inclined to believe

Petitioner's testimony and claims regarding Trobich's communications regarding these maximum sentences.

Petitioner testified that Trobich did not review or explain the sentencing guidelines until after the trial in this matter. The Court finds this testimony particularly incredible in light of Trobich's specific testimony that he focused on the sentencing guidelines with Petitioner because the loss amount would drive the range and Petitioner consistently pressed that the loss amount was too high. Finally, bearing on Petitioner's credibility, Trobich testified that Petitioner never complained about having rejected the first plea deal and tried to hire Trobich to represent him on appeal.

Ultimately, when considering Petitioner's various, sometimes conflicting, claims and testimony at various phases of these proceedings, together with Trobich's credible testimony at the hearing in this matter, the Court finds that Petitioner's claim of ineffective assistance of counsel during plea negotiations is unsupported by credible evidence. Rather, the credible evidence shows that Trobich gave Petitioner a copy of the first plea offer and explained the statutory cap and its other terms, and that Petitioner decided not to accept it unless the Government would agree to forego charges against Okombo. The credible evidence shows that, while there was an issue with the discovery disk, Trobich was able to review all the discovery materials and reviewed discovery with Petitioner at his home after the reverse proffer. The credible evidence also shows that Trobich explained the application of the sentencing guidelines to Petitioner, including the benefit of acceptance of responsibility and particularly relative to the loss amount, which was a sticking point for Petitioner, and explained to Petitioner that, if he did not accept the first plea deal, the sentencing exposure would be "way worse" if he were indicted. The credible evidence also shows that Trobich never characterized the Government's case as "weak" or tried to influence Petitioner's

decision to proceed to trial. Finally, the credible evidence shows that Trobich advised Petitioner that the FDCPA defense was not in their favor, but that he would nonetheless preserve the issue for review. Moreover, other than Petitioner's bare claims, there is no contemporaneous evidence before the Court tending to show that Petitioner would have accepted the first plea deal but for Trobich's alleged ineffective assistance of counsel. See Lee, 137 S. Ct. at 1967.

For all these reasons, the Court concludes, after conducting an evidentiary hearing in this matter, that Petitioner has failed to show deficient performance by counsel relative to plea negotiations before trial.[10] See Strickland, 466 U.S. at 687-88; Lafler, 566 U.S. at 162-63; Frye, 566 U.S. at 145; Libretti, 516 U.S. at 50-51. The Court, therefore, will dismiss this claim.

### 3. Failure to Investigate

Petitioner claims that Trobich "failed to conduct any investigation to properly prepare to subject the prosecution to any adversarial testing process in support of a viable defense." [CV Doc. 1 at 18; see id. at 20-21]. This claim is too vague and conclusory to be considered. See Dyess, 730 F.3d at 359-60. That is, Petitioner fails to allege what favorable evidence additional investigation would have revealed or how it would have supported a defense to the charges against him. See Beaver v. Thompson, 93 F.3d 1186, 1195 (4th Cir. 1996). The Court, therefore, will dismiss this claim.

### 4. Failure to Object to "Enhanced" Sentence

Petitioner also argues that his attorney was ineffective for failing to object to a sentence that was enhanced by facts found by this Court at sentencing and not by a jury, including an 18-point enhancement for the loss amount. [CV Doc. 5 at 10-12]. This claim plainly fails.

---

[10] Petitioner's claim that Trobich failed to explain the difference in an open and conditional guilty plea is too vague and conclusory to be addressed further and the Court will dismiss it. See United States v. Dyess, 730 F.3d 354, 359-60 (4th Cir. 2013) (holding it was proper to dismiss § 2255 claims based on vague and conclusory allegations).

"Sentencing judges may find facts relevant to determining a Guidelines range by a preponderance of the evidence, so long as that Guidelines sentence is treated as advisory and falls within the statutory maximum authorized by the jury's verdict." United States v. Grubbs, 585 F.3d 793, 799 (4th Cir. 2009) (quoting United States v. Benkahla, 530 F.3d 300, 312 (4th Cir. 2008)). As such, it was certainly well within the bounds of reasonable professional assistance for Petitioner's attorney to have declined to object to the Court's fact finding for the purpose of sentencing enhancements. The Court will also dismiss this claim.

### 5. Failure to File a Petition for Writ of Certiorari

A criminal defendant has the right to effective assistance of counsel through the first appeal as of right. See United States v. Williamson, 706 F.3d 405, 416 (4th Cir. 2013). "[O]nce the direct appeal has been decided, the Sixth Amendment right to counsel comes to an end." Id. There is no constitutional right to counsel on collateral review. Id.; Pennsylvania v. Finley, 481 U.S. 551, 555 (1987). Likewise, there is no constitutional right to counsel to pursue a discretionary appeal or petition for certiorari. Ross v. Moffitt, 417 U.S. 600, 610, 612 (1974). As such, there is no constitutional right to the effective assistance of counsel in petitioning for a writ of certiorari. United States v. Dancy, 2019 WL 1087503, at *1 (3rd Cir. 2019) (unpublished); Pena v. United States, 534 F.3d 92, 95 (2d Cir. 2008). Petitioner, therefore, cannot state an ineffective assistance of counsel claim based on his attorney's failure to file a petition for writ of certiorari.

Moreover, the record in Petitioner's criminal matter shows that his attorney complied with his duty to inform Petitioner of his right to petition for writ of certiorari but moved to withdraw, believing that filing such a motion would be frivolous. Sessum, No. 20-4079 (4th Cir. July 6, 2022), ECF No. 76 (Motion to Withdraw). Finally, the issues Petitioner contends he wanted to raise in such petition do not establish prejudice. [CV Doc. 1 at 27-28 (citing the loss calculation

and "opening and closing" jury instructions)]. As such, this claim of ineffective assistance also fails.

### 6. **Ciminelli** and **Percoco**

In his supplemental claim, Petitioner argues that he is "factually, actually and legally innocent of the fraud related charges" after Ciminelli v. United States, 598 U.S. 306, 143 S.Ct. 1121 (2023), and Percoco v. United States, 598 U.S. 319, 143 S.Ct. 1130 (2023), which were decided after Petitioner's appeal and before he filed his motion to vacate. [CV Doc. 5 at 2]. Petitioner asks the Court to vacate his fraud-related convictions and resentence him without them. [Id.].

In Ciminelli, the Supreme Court decided that a federal wire fraud conviction under § 1343 could not be sustained under the "right-to-control" theory. Under that theory, "a defendant is guilty of wire fraud if he schemes to deprive the victim of 'potentially valuable economic information' 'necessary to make discretionary economic decisions.'" 598 U.S. at 308-9, 143 S.Ct. at 1124 (quoting United States v. Percoco, 13 F.4th 158, 170 (2d 2021) (internal quotation marks omitted)). The defendant had participated in a scheme to rig the requirements for a state bidding process so that his company would obtain certain state-funded contracts. Id. at 310. The Supreme Court held that "the 'right-to-control theory' is not a valid basis for liability" under the wire fraud statute and that the district court had erred by instructing the jury that the deprivation of "property" under the statute included "'intangible interests such as the right to control the use of one's assets.'" Id. at 309, 311. "[T]he wire fraud statute," the Court explained, "reaches only traditional property interests." Id. at 316.

Percoco dealt with a prosecution for "honest-services fraud." Percoco, 143 S.Ct. at 1133. Under this theory, a private citizen may owe a duty of honest services to the public in certain

situations.  Id. at 1136-37.  The defendant in Percoco had briefly resigned from his position as the New York Governor's Executive Deputy Secretary to manage the Governor's re-election campaign.  Id. at 1134.  While serving in his campaign role, the defendant influenced the requirements for obtaining state funding for developments in exchange for payments from a developer.  Id. at 1134.  The Supreme Court recognized that "honest-services fraud" is a valid theory of prosecution but held that the jury instructions given by the trial court were too vague.  Id. at 1136-38.  The court had instructed the jury that it could find that the defendant owed the public a duty to honest services when he was not serving as a public official if it found that: "(1) he 'dominated and controlled any governmental business' and (2) 'people working in the government actually relied on him because of a special relationship he had with government.'"  Id. at 1138.

Here, Petitioner was charged with and convicted of making false and fraudulent representations to obtain money from victims.  [CR Doc. 3 at 6-7; CR Doc. 66].  Petitioner contends that the Court's instructions to the jury allowed for a conviction for "wire and mail fraud" under 18 U.S.C. §§ 1341-43 and 1349 whether the property rights involved were "tangible of intangible" and such instructions were "defective on [their] face."  [CV Doc. 5 at 7, 9].  Contrary to Petitioner's claims, however, this Court did not instruct the jury that a person's property rights could be "tangible or intangible."  [See CR Doc. 129: Jury Instructions].  Rather, the Court's instructions were limited to tangible property only and made no reference to intangible property interests.  [Id. at 284-304].  Because the jury convicted Petitioner of a scheme to deprive people of traditional property interests, not under a "right-to-control theory" or for "honest services fraud," Ciminelli and Percoco do not apply.  Moreover, even if those cases did apply, Petitioner procedurally defaulted his claim by failing to raise the appropriate challenge at trial or on appeal.

See Bousley v. United States, 523 U.S. 614, 621-22 (1998); United States v. Bowman, 267 Fed. App'x 296, 299 (4th Cir. 2008). The Court, therefore, will dismiss this claim.

## IV. CONCLUSION

For the foregoing reasons, the Court denies and dismisses Petitioner's Section 2255 Motion to Vacate with prejudice.

Pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

## ORDER

**IT IS, THEREFORE, ORDERED** Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [Doc. 1] is **DENIED** and **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Petitioner's Motion for Leave to Reply to the Government's Response to His Petitioner for Collateral Relief Under Title 28 U.S.C. Section 2255 [Doc. 4] is **DENIED** in accordance with the terms of this Order.

**IT IS FURTHER ORDERED** that Petitioner's Motion for Leave to Supplement His Petition for Collateral Relief Under 28 U.S.C. Section 2255 Based on Recent Supreme Court's New Constitutional Change in Decisional Law [Doc. 5] is **GRANTED**.

**IT IS SO ORDERED**.

Signed: March 4, 2024

Robert J. Conrad, Jr.
United States District Judge